IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DARRYL W. CARSTARPHEN, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 14-00162-CB-C |
| | ) | |
| KIMBERLY-CLARK CORP. and UNITED STEELWORKERS LOCAL NO. 1421, | ) ) ) ) ) | |
| Defendants, | ) ) | |

**ORDER**

This matter is before the Court on motions for summary judgment filed by the Defendants. After considering the motions (Docs. 61 & 63) and supporting briefs (Docs. 62 & 64), Plaintiff's response (Doc. 72), and Defendants' replies (Docs. 73 & 74), the Court finds that the motions are due to be granted.

**Facts[1]**

**The Parties**

Plaintiff Darryl Carstarphen, an African-American male, was employed by Defendant Kimberly-Clark Corporation (the Company) at its Mobile, Alabama paper mill from 1996 until his employment was terminated in 2013. The mill's workers are represented by two separate locals of the United Steelworkers (USW). Local

---

[1] The facts, and all inferences from them, are set forth in the light most favorable to the Plaintiff. *See Allen v. Tyson Food, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (facts and all justifiable inferences must be viewed in favor of nonmoving party). Below, citations are provided for facts in dispute and direct quotations but not for undisputed facts.

1421 represents the bargaining unit within the maintenance, paper mill, fiber, and storeroom departments. Local 1575 represents the bargaining unit within the distribution center/warehouse and the converting, material flow, and exporting departments. Both locals were governed by the same Collective Bargaining Agreement (CBA) during the relevant time period. Carstarphen, who had been a member of both Locals during his employment at Kimberly-Clark, was a member of Local 1421 when his employment was terminated.

**Work History**

Prior to 2010, Carstarphen worked for several years in the converting department. In 2010, he transferred to the dry fiber department where he worked a little over a year before being transferred back to converting due to poor performance. In the converting department, employees were expected to master certain tasks, which were documented in a book, in order to be certified as a Level II operator and pay grade. In October 2011, because Carstarphen was falling behind on his Level II book Patrice Lemonde, the mill's Human Resources manager, Carstarphen's supervisor, and a union representative met with Carstarphen. The discussion at that meeting centered around Carstarphen's failure to make sufficient progress on his book as well as his overall performance. Within the past twelve months, Carstarphen had received an oral reprimand for poor performance and a three-day suspension for a safety violation for failing to lock out equipment he was working on. At the meeting, Carstarphen commented that he had left his lock (necessary to lock out equipment) in the fiber department when he transferred, leading the company to believe that he had not locked out equipment at all during

2

the three months since his transfer.  The company considered this a major safety violation and decided to terminate Carstarphen's employment.

Ultimately, Carstarphen was not terminated for this violation.  Local No 1575, which represented Carstarphen at the time, filed a grievance on his behalf.  The company and the union reached a settlement.  The parties entered into a last chance agreement. Kimberly-Clark agreed not terminate Carstarphen's employment under the following conditions:  (1) Carstarphen was required to complete certain Level II proficiencies by April 1, 2012; (2) Carstarphen received a 16-day suspension; and (3) "any future violation of company rules or unacceptable/inappropriate behavior or performance" would result in termination of Carstarphen's employment.  (Pl.'s Dep. vol. I Ex. 13, Kimberly-Clark Mot. Summ. J. Ex. 2, Doc. 62-2.)  Carstarphen did not sign this agreement, but it was read to him.

In 2013, Carstarphen inquired about a transfer to "the broke center," where waste paper is "repulped" for use in paper production.  Castarphen requested the transfer even though he had completed his Level II book and the broke center job was a lower-paying Level I job.  Eventually, Lemonde, the HR manager, allowed the transfer and arranged for Carstarphen to keep his Level II pay.  At that time, Carstarphen was not meeting expectations in the converting department, and Lemonde hoped to place Carstarphen in a position where he could succeed.  The transfer became effective April 21, 2013.  Due to the transfer, Carstarphen once again became a member of Local 1421.  In the broke center, Carstarphen's supervisor was Rick Lewis, who had worked with Carstarphen in the converting

department.  Lewis was familiar with Castarphen's work history and met with him to set clear performance expectations.

**Coworker's Sexually-Charged Conduct & Statements**

Lewis assigned Mack McInnis, an experienced trainer, to train Carstarphen.  Almost immediately, McInnis began using vulgar, offensive sexually explicit language to and in front of Carstarphen.  McInnis "always talk[ed] about sex the whole time, his whole conversation. . . .  [H]is whole conversation was about sex. . . [a]bout sex with men."  (Pl.'s Dep. vol. I 97, Kimberly-Clark Mot. Summ. J. Ex. 1, Doc. 62-1.)  In one conversation, McInnis told Carstarphen that McInnis's ex-wife said in divorce papers that McInnis was gay.  (*Id.* 110.)  Carstarphen testified that it would take "a book" to write every statement of a sexual nature that McInnis made.[2]  (*Id.* 106.)

Carstarphen went to Lewis, his supervisor, about two weeks after he started in the converting department and asked him to talk to McInnis because "he used vulgar language, profanity [and was] always talking about gay things, gay stuff[.]" (*Id.* 107.)  At this point, Carstarphen did not go into detail about the specifics of McInnis's behavior or statements.  Lewis responded to Carstarphen's complaint by

---

[2] Some examples:  Once McInnis said that "back in the day . . . when they work on the paper machine on the hot side, it was real hot.  When they get done, they go to the cool rooms and they'll take off their shirts and pull up their pants and the mens (sic) in there will rub each other, just rub on each other."  (Pl.'s Dep. 98)..  McInnis also said that "when a man got married [McInnis and others would] hold him down and pull [the victim's] willie whacker out and paint it blue." (*Id.*)  On one occasion McInnis said to Carstarphen that "he was tired of jacking off with his right hand." (*Id.* 95.)  In Carstarphen's presence, McInnis made several remarks to the a coworker about wanting to hold that coworker, hug him, get into bed with him." (*Id.* 99.)  In front of Carstarphen, McInnis asked the same coworker "to lean over the desk so he could stick his ___ in his _____." (*Id.* 96.)  On another occasion, McInnis "was humping the door frame as if he was having sex." (*Id.* 97.)

4

suggesting that he take his break in a different area.  Carstarphen explained that the offensive conduct was not happening on break but in the work area.  Lewis just "brushed it off, . . . like he didn't really want to hear it."  (*Id.* 119.)

Carstarphen discussed the issue again at a sixty-day progress review meting with Lewis and Ricky Byrd, the union shop steward.  At that time, Carstarphen told Lewis how McInnis had been carrying on and specifically told him that McInnis had "asked Ricky McGhee to lean over the desk . . . so he could stick his ___ in his ____."[3]  (*Id.* 139.)[4]  Carstarphen asked to be moved to another shift, and Lewis agreed.

**Quality Defect Leads to Carstarphen's Termination**

Carstarphen was reassigned to C shift where his supervisor was Calvin Crosby.  On July 7, 2013, his first day on C shift, a problem occurred with a batch of pulp sent from the broke center to the tissue manufacturing department.  The result was a quality defect known as "broke spots" causing the rejection of an entire batch of product.  When fiber in the pulp is not sufficient broken down, chunks of fiber show up in the paper as colored spots, known as broke spots.  To prevent broke spots, a batch test of the pulp mixture is performed before the mixture is sent to the tissue manufacturing center.  The process of mixing and sending a batch is an entry-level job that could be mastered in a day or two.  Testing a batch before sending it is

---

[3] The Court has omitted the specific words used.
[4] Lewis's version of events is different.  According to Lewis, at Carstarphen's thirty-day progress review, on May 31st, Lewis talked with Carstarphen about teamwork and the need to inform his team of his whereabouts because Lewis had been informed that Carstarphen was not keeping his team informed when he took outside breaks or left the area. (Lewis Decl. ¶ 10, Kimberly-Clark Ex. F, Doc. 62-9.) At the sixty-day meeting, Lewis says, Carstarphen told him only that he wanted to transfer to a different shift because his coworkers used profanity and were nasty because they chewed tobacco which Carstarphen "disliked to be around." (*Id.* ¶ 14.)

the first thing an employee learns when working in the broke center. The employee who sends the batch (a process known as "making the dump") is responsible for testing it.

Carstarphen mixed and tried to send a batch of pulp, but "[i]t wouldn't dump." (Pl.'s Dep. vol. II 520, Kimberly-Clark Ex. E, Doc. 62-6.) He went to a coworker and asked for help, and his coworker sent him to Crosby. (*Id.*) Crosby told him not to worry about it and that he would handle it. Carstarphen admits that he did not test the batch before he tried to dump it. (*Id.* 524.) Ultimately, Crosby dumped the batch. Later, someone from the tissue manufacturing center told the employees in the broke center that the batch contained broke spots.

Lewis questioned the employees who were working "when the broke spots occurred and learned that [Carstarphen] was responsible for sending the defective batch of pulp." (Lewis Decl. ¶ 19.) According to Lewis, Carstarphen, as the person sending the batch, also was responsible for testing it. (*Id.*) Carstarphen denied, however, that he had sent the batch but "eventually admitted that he had and had even contacted . . . Crosby. . . for assistance because the batch clogged as he tried to send it." (*Id.* ¶ 20.) Carstarphen told Lewis that "he was not sure if he had performed a batch test before he sent the pulp and admitted he did not always perform the test." (*Id.* ¶ 21.) Lewis reported his findings to Patrice Lemonde, human resources manager.

Lemonde made the decision to terminate Carstarphen's employment "because of a culmination of events all in violation of his Last Chance Agreement." (Lemonde Decl. ¶ 16, Kimberly-Clark Ex. C, Doc 62-4.) Those events include, "his

operator error in the broke center resulting in defective product, his failure to take responsibility for that error and his poor performance, both in mastering skills and working effectively with his co-workers." (*Id.*)

**The Grievance Procedure**

Kimberly-Clark notified Carstarphen of his termination on July 25, 2013. The following day, Local 1421 filed a grievance on Plaintiff's behalf. A "first step" meeting was held in accordance with the grievance procedures set forth in the Collective Bargaining Agreement (CBA) between the union and the company. Carstarphen was represented at that meeting by Randy Calhoun, Local 1421 president, and Rodney Byrd, Local 1421 shop steward. Because the grievance involved a termination, the grievance process proceeded immediately to the "third step," and the USW International Union representative, David Trostle became involved. As an employee of the International Union, Trostle negotiates collective bargaining agreements and handles third step grievances and arbitrations for several Locals in Alabama and Florida. At the third step meeting on August 19, 2013, Trostle advocated on Carstarphen's behalf, presented Carstarphen's side of the events, and requested that the company reinstate him. Carstarphen was present at the meeting and had an opportunity to speak.

In late August, the company denied Carstarphen's appeal. Under the terms of the CBA the Union had the option to take that decision to arbitration. The Union continued to investigate. Employees in the broke center denied allegations of sexual harassment, and employees who were present when the defective batch occurred did not support Carstarphen's version of events. In addition, Trostle obtained

7

information from the company regarding the 2011 Last Chance Agreement. On September 23, Calhoun and Trostle met with Carstarphen. They discussed the company's evidence and asked Carstarphen if he had information or witnesses who could support his version of events  Trostle also told Carstarphen that the terms of the last chance agreement permitted termination based on violation of a company rule or unacceptable job performance. After the meeting, Trostle investigated whether other current employees were subject to last chance agreements (none were) and also investigated the circumstances leading to Carstarphen's last chance agreement. Trostle concluded that the last chance agreement was valid, even though Carstarphen did not sign it, as the settlement of a grievance between the Union and the Company.

Based on his investigation, Trostle decided not to arbitrate Carstarphen's termination. Trostle took into account Carstarphen's work history, prior discipline, and the company's efforts to work with Carstarphen to find a job he could do successfully. Trostle also considered the effect of the last chance agreement which allowed for termination based on a single instance of poor performance. Carstarphen's claim that he was not responsible for the reject batch on July 7 was not credible, in Trostle's opinion.

**Carstarphen's Complaints About Sexual Harassment**

As noted above, Carstarphen first reported McInnis's behavior to Lewis, his supervisor, in mid-May, but Lewis brushed him off. He reported it again, this time with more specificity, at his performance review in late June with Lewis and Union representative Byrd. At that time, Carstarphen requested, and was granted,

8

reassignment to a different shift. On July 24, 2013, one day prior to his termination, Carstarphen reported to Patrice Lemonde that McInnis was talking about sex "all day" and "using heavy vulgar language and profanity." On August 5, 2013, Carstarphen filed a charge of discrimination with the EEOC. On that form, Carstarphen checked boxes indicating that he was complaining of discrimination based on race, sex and retaliation. (Pl.'s Dep. vol. 1 Ex. 5, Doc 62-2.)

**Procedural Background**

On April 8, 2014, Carstarphen initiated this action by filing a complaint against Kimberly-Clark and the Union under § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. §§ 141 *et seq.* This action was assigned to Magistrate Judge Cassady for trial.[5] In his amended LMRA complaint, Plaintiff asserted that the Union violated its duty of fair representation as follows: (1) by failing to take "meaningful action" on Plaintiff's grievance, (2) by failing to communicate honestly or provide information to Plaintiff regarding the grievance process, (3) by failing and refusing to communicate about his grievance or to inform him of its decision regarding arbitration, (4) because its actions (or inactions) were the result of racial discrimination, and (5) because its actions (or inactions) were the result of retaliation for Plaintiff's complaints of sexual harassment. (*Id.* ¶¶ 26-27.) Finally, the amended LMRA Complaint alleged that both the Union and the Company are liable for violating the LMRA because Plaintiff's termination was

---

[5] The case was randomly assigned to Magistrate Judge Cassady on an "opt out" basis, meaning that any party could opt to have the case reassigned for trial to a district judge. (Doc. 2.) No party did so, and the case was assigned to Magistrate Judge Cassady. (Doc. 25.)

motivated by discrimination and retaliation and, therefore, violated the CBA's nondiscrimination clause.

On October 20, 2014, Plaintiff filed a motion for leave to file a second amended complaint. The proposed second amended complaint added retaliation and discrimination claims under Title VII. The motion for leave to amend was denied because Plaintiff failed to show good cause for his failure to amend within the Rule 16(b) deadline for amending pleadings.

After his attempt to amend was rebuffed, Plaintiff filed a new action (Civil Action 14-00504) against Kimberly-Clark and Local 1421, based on the same facts in the LMRA action, asserting claims under Title VII. In the Title VII complaint, Plaintiff asserted claims against Kimberly-Clark for sexual harassment, retaliation, and race discrimination and claims against the Union for retaliation and race discrimination. (Doc. 52, Entry 1.) The Title VII action was assigned to the undersigned district judge. The parties filed a joint motion to consolidate the LMRA action and the Title VII action. That motion was granted and the civil actions were consolidated. (Doc. 51.)

**Issues Presented**

In response to Defendants' motions for summary judgment, Plaintiff has failed to address, and therefore abandoned, numerous claims.[6] Specifically, Plaintiff's Title VII claims based on race discrimination and sexual harassment

---

[6] "[T]he onus is upon the parties to formulate arguments; *grounds raised in the complaint but not relied upon in summary judgment are deemed abandoned.*" *RTC v. Dunbar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

against both defendants are abandoned as are most of Plaintiff's fair representation claims under the LMRA.

Plaintiff's remaining claims are based on his allegation that he was terminated in retaliation for complaints of sexual harassment. As a result, he asserts that both Defendants are liable under Title VII <u>and</u> the LMRA for retaliation.[7]

**Legal Analysis**

### Summary Judgment Standard

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied his responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. *Id.* On summary judgment review, "the facts--as supported by the evidence in the record--and reasonable inferences from those facts" must be viewed in the light most favorable to the nonmoving party. *Young v. City of Palm Bay, Florida*, 358 F.3d 859, 860 (11th Cir. 2004).

### Title VII Retaliation Claim

Title VII makes it unlawful for an employer or a labor union to discriminate on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2. It also prohibits retaliation by an employer or labor union against one who has

---

[7] Although Plaintiff merges his Title VII and LMRA claims into one Title VII argument, they are separate claims and will be addressed separately below.

engaged in statutorily protected conduct. *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999); 42 U.S.C. § 2000e-3(a). Statutorily protected conduct includes opposition to "any practice made unlawful by [Title VII]." *Clover*, 176 F.3d at 1350. When a plaintiff relies on circumstantial evidence to support a retaliation claim under Title VII, the evidence is evaluated using the familiar "shifting burdens" analysis set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (retaliation). "To prove discriminatory [or retaliatory] treatment through circumstantial evidence: (1) a plaintiff must first make out a prima facie case, (2) then the burden shifts to the defendant to produce legitimate, nondiscriminatory reasons for the adverse employment action, and (3) then the burden shifts back to the plaintiff to establish that these reasons are pretextual." *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1375 (11th Cir. 1996) (internal citations omitted). To establish a prima facie case of discrimination, Plaintiff must establish: (1) that he engaged in statutorily protected expression, (2) that he suffered an adverse employment action, and (3) a causal link between the two. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

Plaintiff cannot prevail on a Title VII retaliation claim against the Union. Because Plaintiff conflates his Title VII and LMRA claims, his precise theory of liability is murky. He takes issue with the Union's failure to arbitrate his grievance, which could be considered an adverse action on the part of the Union. However, the reason he claims the Union failed to arbitrate is the epitome of a *nonretaliatory* reason. Plaintiff argues that the Union, in making its decision not to arbitrate, "failed

12

to even consider the possibility that the company acted in retaliation for Plaintiff's allegations." (Pl.'s Br. 8, Doc. 72.) Obviously, if retaliation wasn't considered by the Union, it was not a motivating factor for the decision.[8] Therefore, the Union cannot be held liable for retaliation under Title VII.

Plaintiff's retaliation claim against Kimberly-Clark fails as well. Although Kimberly-Clark mounts a multi-pronged attack on Plaintiff's Title VII claim, the Court need address only one. Kimberly-Clark had a legitimate nonretaliatory reason for its decision to terminate Plaintiff's employment. The settlement of a previous grievance had placed Plaintiff on a last chance agreement. The terms of that agreement provided that "any future violation of company rules or unacceptable/inappropriate behavior or performance" would result in Plaintiff's termination.

Plaintiff was terminated for unacceptable performance, a legitimate nonretaliatory reason. On July 7, 2013, Plaintiff attempted to send a batch of pulp without testing it. That batch resulted in a large quantity of rejected product. Plaintiff subsequently tried to shift responsibility to a coworker. Plaintiff admitted that he did not always follow procedure, which required that each batch be tested.

Plaintiff maintains that the reason for his termination was pretextual for three reasons, none of which is sufficient to create a genuine issue of fact. First, he argues the last chance agreement violated the CBA, and if not for the last chance agreement he could not have been terminated for his actions. The logic in this

---

[8] Plaintiff argues that the Union's "decision not to arbitrate and its failure to consider the company's conduct as retaliation. . . amounts to the union joining in the discrimination of the company." (*Id*.) Plaintiff provides no legal authority for his novel theory that retaliatory intent can be imputed from the actions of another.

argument is elusive since the last chance agreement was entered two years *before* Plaintiff's complaints of sexual harassment or his termination.  As Kimberly-Clark points out, it strains credulity to believe that the company entered into an agreement to return Plaintiff to work so that it could later fire him in retaliation for a complaint that had not yet occurred.  Second, Plaintiff maintains that he did nothing wrong because he did not actually "dump" the material.  He does not dispute, however, that he created and failed to test the batch that resulted in the rejected product, or that he shifted blame to a coworker, or that he admitted that he did not always test each batch.  Third, Plaintiff argues that his discipline was disproportionate because "[t]he only other person disciplined for 'broke' spots as far back as the union president could remember received only an oral reprimand." (Pl.'s Br. 8.)   This attempted reliance on comparator evidence falls short because "the quantity and quality" of the comparator's misconduct must be "nearly identical" to that of the plaintiff before the Court can consider it. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999) (nearly identical conduct requirement keeps courts "from second-guessing employers' reasonable decisions and confusing apples with oranges").  Plaintiff has failed to point to evidence from which a reasonable trier of fact could conclude that the Company's legitimate nonretaliatory reasons for firing him were pretext for discrimination.  Kimberly-Clark is, therefore, entitled to summary judgment on Plaintiff's retaliation claim against it.

    **LMRA Claim**

14

In *DelCostello v. International Brotherhood of Teamsters*, the Supreme Court explained the nature of a "hybrid" § 301/fair representation, which is the type of claim Plaintiff has asserted here.

> It has long been established that an individual employee may bring suit against his employer for breach of a collective bargaining agreement. Ordinarily, however, an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement. Subject to very limited judicial review, he will be bound by the result according to the finality provisions of the agreement. In *Vaca* [*v. Sipes*, 386 U.S. 171, (1967)] and *Hines* [*v. Anchor Motor Freight,* 424 U.S. 554 (1976*)*], however, we recognized that this rule works an unacceptable injustice when the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation. In such an instance, an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding. Such a suit, as a formal matter, comprises two causes of action. The suit against the employer rests on § 301, since the employee is alleging a breach of the collective bargaining agreement. The suit against the union is one for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act. "Yet the two claims are inextricably interdependent. '*To prevail against either the company or the Union, ... [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Unio*n.'".

*DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 163-65 (1983) (quoting Mitchell, 451 U.S., at 66–67 (Stewart, J., concurring in the judgment)) (emphasis added). Plaintiff's claims fail on both requirements set forth in *DelCostello*. He cannot demonstrate that retaliatory termination violates the CBA, nor can he demonstrate that the Union breached its duty of fair representation.

Plaintiff asserts that his termination violates the CBA's nondiscrimination clause, which states:

> The parties signatory to this agreement shall not discriminate against any employee because of race, color, religion, sex, national origin, creed, age, handicap, marital status, union membership or union activity which is not in conflict with law or the provisions of this agreement.

(Pl.'s Dep. Vol. II Ex. 26 ¶2(H).)  This provision clearly prohibits discrimination, but it neither explicitly nor implicitly prohibits retaliation.  Since retaliation is not covered by the nondiscrimination clause, Plaintiff's termination did not violate this provision of the CBA.[9]

Like many of his other arguments, Plaintiff's theory regarding the Union's alleged breach of the duty of fair representation is not clearly presented.  As best the Court can discern, Plaintiff contends that the Union breached its duty by failing to arbitrate when it knew the company had terminated Plaintiff shortly after he complained of sexual harassment.  "In order to establish that the union has breached its duty of fair representation it must be shown that the union's handling of the grievance was either "'arbitrary, discriminatory, or in bad faith,' as, for example, when it 'arbitrarily ignore(s) a meritorious grievance or process(es) it in (a) perfunctory fashion.'"  *Harris v. Schwerman Trucking Co.*, 668 F.2d 1204, 1206 (11th Cir. 1982) (quoting *Int'l Brotherhood of Elec. Workers v. Foust*, 442 U.S. 42, 47 (1979)). The Union did not ignore Plaintiff's grievance or treat it perfunctorily.  Rather, it advocated on Plaintiff's behalf through the third step of the grievance process.

A decision not to arbitrate a nonmeritorious grievance, made after investigation, does not violate the duty of fair representation.  *McCollum v. Bolger*,

---

[9] Plaintiff relies on the nondiscrimination clause but makes no effort to demonstrate how or why it might prohibit retaliation.

16

794 F.2d 602, 612 (11th Cir. 1986).  Trostle, the Union representative, diligently investigated Plaintiff's case before declining to take the case to arbitration. Trostle apparently considered and rejected two possible bases for pursuing Plaintiff's case in arbitration.  First, he could not challenge the factual basis for the company's decision because he could find any witnesses to support Plaintiff's version of events regarding either the alleged sexual harassment or the events resulting in the defective product.   Second, after conducting research, he concluded that he could not attack the validity of the last chance agreement, which was the legal basis for the termination.  Because Trostle concluded, after adequate investigation, that Plaintiff's claims lacked merit, the Union cannot be held liable for violating the duty of fair representation.[10]

**Conclusion**

The evidence, even viewed in the light most favorable to the Plaintiff, does not support a judgment in Plaintiff's favor against either Defendant on any of the claims presented.  Therefore, Defendants' motions for summary judgment filed are **GRANTED**.

**DONE** and **ORDERED** this the 21st day of September, 2015.

                                                s/*Charles R. Butler, Jr.*
                                                **Senior United States District Judge**

---

[10] The Court declines to address the Union's alternative argument that it cannot be held liable for any violation by Trostle because Trostle is employed by the International Union, not the Local.